IN THE CIRCUIT COURT OF THE
FOURTH JUDICIAL CIRCUIT IN AND
FOR DUVAL COUNTY, FLORIDA

ACOSTA INC.,

      Plaintiff,                         CASE NO.:

v.

VNGR BEVERAGE, LLC d/b/a POPPI,

      Defendant.

_____/

## COMPLAINT

Plaintiff, Acosta Inc. ("Acosta"), sues Defendant, VNGR Beverage, LLC d/b/a Poppi ("Poppi"), and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Acosta is a Delaware corporation with its principal place of business in Jacksonville, Florida.

2.      Poppi is a Texas limited liability company.

3.      Poppi is subject to the jurisdiction of this Court in accord with Section 48.193, Florida Statutes, and the Constitution because, among other things: Poppi agreed in a Master Agreement (defined below) between it and Acosta that the exclusive jurisdiction and venue for any dispute between the parties was in Jacksonville, Florida, and Florida law would control; Poppi breached the Master Agreement by failing to pay Acosta in Florida where payment was due; Poppi routinely works with Acosta in Florida; and Poppi engages in substantial and not isolated business activities in Florida to include selling its products in Florida.

4.      This Court has subject matter jurisdiction over this action because the amount in controversy exceeds $50,000.00, exclusive of interest, costs, and attorneys' fees.

5.      Venue is proper in this Court because the Master Agreement provides for exclusive venue in Jacksonville, Florida, and the causes of action at issue accrued in Jacksonville, Florida.

## GENERAL ALLEGATIONS

6.      Acosta provides various services to its manufacturer clients, to include marketing and sales support, to assist its clients in getting their products placed and sold in stores through various "business channels." For example, grocery stores, like Publix, are encompassed within the grocer business channel and certain larger retailers, like Walmart, are considered their own business channel.

7.      Acosta's sales and marketing services include, *inter alia*, both headquarter sales at various retailers and in-store sales and marketing services that include activities at the store-specific retail level such as building displays and taking action to ensure shelf conditions comply with retailer planograms and client direction.

8.      Poppi is a prebiotic soda brand.

9.      On or about April 1, 2023, Acosta and Poppi entered into a Master Services Agreement (the "Master Agreement"), pursuant to which Acosta agreed to provide certain services to Poppi, to include, without limitation, serving as Poppi's exclusive sales representative to market Poppi's products in certain territories, with such services and territories to be defined in statements of work. A true and correct copy of the Master Agreement is attached as **Exhibit A**.

10.     Since the inception of the parties' relationship, and as Acosta placed Poppi's products in new business channels, the parties would document their agreement for each new business channel in a statement of work or through an exchange of written communications establishing the terms of the placement and other business arrangements. Some of these statements

2

EXHIBIT 1
PAGE 2 of 47

of work were memorialized in formal written documents and others were documented in less formal exchanges between the parties.

11.     In exchange for Acosta's services, Poppi agreed to pay Acosta for its services as set forth in the Master Agreement, to include a monthly commission payment and performance bonus where applicable, as the Master Agreement defined those terms.

12.     At the time Acosta and Poppi entered into the Master Agreement, Poppi was a developing brand with limited retailer distribution and Acosta took a risk in taking on Poppi as a new brand. Additionally, Poppi repeatedly advised Acosta that Poppi's goal was to increase Poppi's value, largely through the efforts of Acosta's performance under the Master Agreement, and then sell the company to a third party.

13.     Accordingly, to incentivize Acosta to take on this new brand and help to grow Poppi to become a lucrative buyout target with national retail distribution, which Poppi repeatedly stated was its ultimate goal, Acosta and Poppi agreed to certain incentive compensation for Acosta if Poppi was successfully sold. More specifically, the Master Agreement provides that Acosta is entitled to a "Change of Control Payment" in the event of a transaction constituting a "Change of Control" of Poppi.

14.     Section 2.6 of the Master Agreement provides, in its entirety:

Change of Control. During the Term, the Client will provide written notice to Acosta upon completion of a transaction constituting a Change of Control of Client. The Client agrees to pay to Acosta, in addition to any other payments that are or may become due hereunder, a lump sum payment equal to one percent (1%) of the gross sales price, without deduction or offset (the "Change of Control Payment"). The Client agrees to deliver to Acosta the Change of Control Payment within thirty (30) days of the closing of the Change of Control. For purposes hereof, "Change of Control" means (a) the sale of all or substantially all of the assets of the Client, or (b) any merger, consolidation or acquisition of the Client with, by or into another corporation, entity or person or (c) any acquisition by one entity or person of 51% or greater of the membership interests or shares, as applicable, of the Client in one or more transactions.

3

EXHIBIT 1
PAGE 3 of 47

15.     Acosta succeeded in its sales and marketing efforts as Poppi quickly developed into a national brand with nationwide placement in countless retailers and exponential sales growth. Indeed, Acosta's efforts resulted in Poppi's sales increasing by over 500%.

16.     However, beginning in late 2024, without explanation of any kind, and despite Poppi continuously praising Acosta's performance and services, Poppi began sending Acosta correspondence purporting to terminate the Master Agreement and the parties' statements of work relating to various business channels, including the military channel, Costco channel, and grocery channel.

17.     Acosta has since learned that Poppi's "termination" communications were sent to Acosta for no other reason than to attempt to evade the Change of Control Payment that Poppi willingly and specifically agreed to pay to Acosta at the inception of the parties' relationship.

18.     Despite the purported terminations, Poppi continued to request and Acosta continued to perform services on Poppi's behalf in these same channels. Indeed, to date, Acosta continues to provide services on Poppi's behalf in the military channel, as well as mandate services in the grocery channel.

19.     On March 17, 2025, PepsiCo ("Pepsi") released a press release stating that Pepsi "has entered into a definitive agreement to acquire Poppi, a fast-growing prebiotic soda brand, for $1.95 billion" (the "Press Release"). A true and correct copy of the Press Release is attached as **Exhibit B**.

20.     After Pepsi issued the Press Release, Pepsi provided authorization to Acosta for Acosta to continue performing work on Poppi's behalf in the military channel referenced above.

4

**EXHIBIT 1**
**PAGE 4 of 47**

21.     Pepsi's acquisition of Poppi was "completed" within the meaning of the Master Agreement no later than March 17, 2025, and constitutes a Change of Control within the meaning of section 2.6 of the Master Agreement. Pepsi's acquisition of Poppi therefore triggered Poppi's obligation to pay Acosta the one percent (1%) Change of Control Payment (to be paid within thirty (30) days of the transaction closing).

22.     After Pepsi issued the Press Release, it became apparent to Acosta that Poppi was attempting to terminate the Master Agreement and the parties' various statements of work, while simultaneously requesting and accepting the benefit of Acosta's services, for no other reason than attempting to avoid paying Acosta the promised Change of Control Payment to which Acosta is entitled under the Master Agreement.

23.     Accordingly, on April 15, 2025, Acosta sent Poppi a letter (the "Request Letter") regarding, *inter alia*, Poppi's purported termination of the Master Agreement and the parties' statements of work—while Poppi continued to request and accept the benefit of Acosta's services—and requested that Poppi confirm that it will timely pay the Change of Control Payment to Acosta in accord with the Master Agreement based on Pepsi's acquisition of Poppi. A true and correct copy of the Request Letter is attached as **Exhibit C**.

24.     Acosta's Request Letter also requested that Poppi comply with its other contractual obligations under the Master Agreement. Specifically, Poppi had failed to timely pay Acosta for services, to include services in the military and Costco channels, and failed to provide Acosta with the necessary order data, as set forth in Section 2.3 of the Master Agreement, to enable Acosta to confirm amounts Poppi paid Acosta. Accordingly, Acosta's Request Letter also requested that Poppi immediately pay the past due sums, totaling approximately $350,000.00 as of the date of the Request Letter, as well as provide the required order data to Acosta.

5

EXHIBIT 1
PAGE 5 of 47

25.     On April 25, 2025, Poppi, through its outside counsel, sent a response to Acosta's Request Letter (the "Response Letter"). In the Response Letter, a true and correct copy of which is attached as **Exhibit D**, Poppi stated that "no Change of Control payment is due to Acosta."

26.     On May 19, 2025, Pepsi released another press release, a copy of which is attached as **Exhibit E**, announcing "that it has closed the acquisition of Poppi for $1.95 billion[.]"

27.     To date, Poppi has not paid Acosta the Change of Control Payment. Poppi made a partial payment of the past due sums owed to Acosta described above, but approximately $50,000.00 remains outstanding, and Poppi still has not provided Acosta with the necessary order data to confirm amounts paid and owed.

28.     All conditions precedent to the maintenance of the causes of action alleged herein have been complied with, have occurred in fact or by operation of law, or have been waived.

<u>**COUNT I – BREACH OF CONTRACT**</u>

29.      Acosta realleges and incorporates by reference paragraphs 1 through 28 as if set forth fully herein.

30.     The Master Agreement is a valid and enforceable contract.

31.     Acosta has performed and continues to perform its obligations under the Master Agreement.

32.     Poppi has unequivocally stated that it will not perform its obligation under the Master Agreement to pay Acosta the Change of Control Payment to which Acosta is entitled within thirty (30) days of the closing of Pepsi's acquisition of Poppi. Poppi's absolute, unequivocal statement that it will not pay Acosta the Change of Control Payment amounts to an anticipatory breach of the Master Agreement by Poppi.

6

EXHIBIT 1
PAGE 6 of 47

33.     Poppi's anticipatory beach of the Master Agreement has caused and will cause Acosta to suffer damages.

34.     Poppi has also breached the Master Agreement by failing to pay Acosta sums due thereunder for services Acosta provided on Poppi's behalf, as well as failing to provide Acosta with the required order data to enable Acosta to confirm amounts paid and owed, which has caused Acosta to suffer damages.

35.     Acosta has retained the law firm of Smith, Gambrell & Russell, LLP to represent it in this matter and is obligated to pay its attorneys' fees incurred in connection herewith.

36.     Pursuant to section 2.2 of the Master Agreement, Acosta is entitled to recover its attorneys' fees from Poppi.

WHEREFORE, Acosta requests this Court enter judgment in favor of Acosta and against Poppi for damages, together with interest, attorneys' fees, and costs, and for such other and further relief as the Court deems just and proper.

## COUNT II – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

37.     Acosta realleges and incorporates by reference paragraphs 1 through 28 as if set forth fully herein.

38.     The Master Agreement is a valid and enforceable contract giving rise to an implied covenant of good faith and fair dealing.

39.     Prior to Acosta and Poppi entering into the Master Agreement, Poppi was a developing brand with limited market placement and Poppi repeatedly advised Acosta that Poppi's intention was to grow the company and then sell it. Accordingly, in the Master Agreement, Poppi specifically agreed that it would pay Acosta the Change of Control Payment in the event of a Change of Control transaction, which transaction was Poppi's ultimate goal.

7

EXHIBIT 1
PAGE 7 of 47

40.     After the parties entered into the Master Agreement, Acosta succeeded in its sales and marketing efforts resulting in exponential sales growth, which made Poppi an attractive buyout target. This was the exact scenario Poppi and Acosta contemplated when agreeing to the Change of Control Payment provision of the Master Agreement. Indeed, Acosta made extra efforts on behalf of Poppi to help it achieve its goals with the reasonable expectancy that it would be compensated for these efforts in accord with the Master Agreement.

41.     After Acosta wildly succeeded in its efforts, and Poppi knew that it was going to be acquired by Pepsi, Poppi began purported attempts to terminate the Master Agreement and the parties' statements of work solely in an effort to try to avoid the Change of Control Payment that it knew would come due upon completion of the sale to Pepsi. Despite these purported attempts at termination, Poppi continued to request, and Acosta continued to provide, services in the same business channels.

42.     In addition to Poppi's breaches of the express provisions of the Master Agreement, as set forth above, Poppi has also breached the implied covenant of good faith and fair dealing by purporting to terminate the Master Agreement while simultaneously requesting and accepting the benefit of Acosta's services solely in a deliberate attempt to avoid paying Acosta the approximately $19,000,000.00 Change of Control Payment to which Acosta is entitled under the Master Agreement.

43.     While the Master Agreement permits Poppi to terminate the Master Agreement in certain circumstances, the Master Agreement does not permit Poppi to terminate its agreements with Acosta solely to avoid making the Change of Control Payment, which was a cornerstone of the foundation of the parties' relationship at its inception. To the contrary, Poppi's actions in attempting to terminate the Master Agreement solely to avoid making the Change of Control

8

**EXHIBIT 1**
**PAGE 8 of 47**

Payment is a clear breach of Poppi's implied covenant of good faith and fair dealing. Moreover, such payment under the circumstances alleged herein was a fundamental inducement for Acosta to enter into the Master Agreement and Poppi's breach of the implied covenant of good faith and fair dealing has unfairly frustrated the purpose of the Master Agreement and disappointed Acosta's reasonable expectations thereunder.

44.     Poppi's breach of the implied covenant of good faith and fair dealing has deprived Acosta of the benefits of the Master Agreement and Acosta has suffered damages as a result.

45.     Acosta has retained the law firm of Smith, Gambrell & Russell, LLP to represent it in this matter and is obligated to pay its attorneys' fees incurred in connection herewith.

46.     Pursuant to section 2.2 of the Master Agreement, Acosta is entitled to recover its attorneys' fees from Poppi.

WHEREFORE, Acosta requests this Court enter judgment in favor of Acosta and against Poppi for damages, together with interest, attorneys' fees, and costs, and for such other and further relief as the Court deems just and proper.

EXHIBIT 1
PAGE 9 of 47

**SMITH, GAMBRELL & RUSSELL, LLP**

*/s/ Nicole L. Kalkines*
ALAN S. WACHS
Florida Bar No.: 980160
awachs@sgrlaw.com
tgreene@sgrlaw.com
dhsmith@sgrlaw.com
STEVEN E. BRUST
Florida Bar No. 0832091
sbrust@sgrlaw.com
asalane@sgrlaw.com
NICOLE L. KALKINES
Florida Bar No. 1003293
nkalkines@sgrlaw.com
bwheeler@sgrlaw.com
50 N. Laura Street, Suite 2600
Jacksonville, Florida 32202
Tel.: (904) 598-6110
Fax: (904) 598-6210

*Attorneys for Plaintiff, Acosta Inc.*

10

**EXHIBIT 1**
**PAGE 10 of 47**

# EXHIBIT A

**EXHIBIT 1**
**PAGE 11 of 47**

# MASTER SERVICES AGREEMENT

| | |
|---|---|
| **Client Legal Name:** | VNGR Beverage  LLC dba Poppi |
| **Client Billing Address:** | 7047 Twin Hills Avenue, Dallas, TX, 75231 |
| **Phone:** | 917-579-3066     **Fax:**     N/A |
| **Client Contact:** | Jeff Rubenstein     **Email:**     jeff@drinkpoppi.com |

This **MASTER SERVICES AGREEMENT** (including all Schedules attached hereto, this "Agreement"), dated as of the latest date set forth on the signature page hereto (the "Effective Date"), is by and between Acosta Inc., a Delaware corporation whose address is 6600 Corporate Center Parkway, Jacksonville, Florida 32216 ("Acosta"), and the client identified above ("Client"). Acosta and the Client may individually be referred to as a "Party" and collectively as the "Parties." In consideration of the agreements, covenants, representations and warranties contained in this Agreement, the Client and Acosta agree as follows:

## ARTICLE I: SERVICES; TERM

Section 1.1     Services; Statement of Work. During the Term, and in accordance with the provisions contained in this Agreement, Acosta will provide certain services to the Client, including serving as the Client's exclusive sales representative to market the Client's products ("Products") at the prices the Client delivers to Acosta in writing on the Effective Date ("Product Prices") in certain territories, which services (collectively, the "Services") and Products will be defined by Statements of Work (each, a "SOW"). Each SOW will (a) contain a description of the Services to be provided under such SOW, (b) set forth the rates payable to Acosta as consideration for the Services, (c) set forth the term of the SOW, and (d) provide any other relevant provisions applicable to the Services deemed necessary by the Parties. If there is a conflict between the provisions contained in any SOW and the provisions contained in this Agreement, then the provisions contained in this Agreement will control. The Client may from time to time request a change in the scope of Services to be provided under any SOW (each, a "Change Request"). Upon Acosta's receipt of a Change Request from the Client, Acosta and the Client will negotiate in good faith to amend, supplement or otherwise change the provisions contained in such Statement of Work, including any changes to the applicable timelines and rates, by executing and delivering a new SOW which expressly replaces the preceding SOW or amending the existing SOW.

Section 1.2     Term; Termination. This Agreement shall commence on the Effective Date and continue until terminated in accordance with the provisions of this Section 1.2 ("Term"). Either Party may terminate this Agreement and/or any SOW if the other Party commits a material breach of this Agreement and/or any SOW and fails to cure such material breach within thirty (30) days of written notice from the non-breaching Party. Either Party may terminate this Agreement with thirty (30) days' prior written notice to the other Party if there is not a SOW outstanding. Anything contained herein to the contrary notwithstanding, if the Client fails to pay any amounts due pursuant to the provisions contained in this Agreement and/or any SOW, then Acosta will have the right, in addition to its other remedies and rights, upon expiration of the foregoing thirty (30) day cure period, to either (a) suspend performance of the Services, in whole or in part, until all outstanding amounts have been paid in full, or (b) immediately terminate this Agreement and/or any SOW by delivering written notice thereof to the Client. Any provision of this Agreement which imposes an obligation after the termination of this Agreement shall survive the termination of this Agreement.

Section 1.3     Effect of Early Termination. On the termination of this Agreement for any reason: (a) the Client will promptly pay Acosta for any Services performed and reimburse Acosta for any costs and expenses incurred on or before the effective date of termination of this Agreement, (b) Acosta will immediately discontinue providing the Services, and (c) each Party will deliver to the other Party, or, at the disclosing Party's option, destroy, all of the disclosing Party's Confidential Information, documents, materials and personal property that are in the receiving Party's control or possession (in all forms and in all media), and all copies thereof, except that the receiving Party may retain one (1) copy of such Confidential Information, documents and materials for its records.

## ARTICLE II: FEES, EXPENSES AND PAYMENT

Section 2.1     Fees and Expenses. In accordance with the provisions of this Agreement, the Client shall pay Acosta the commission ("Commission") and fees ("Fees") described in each SOW (collectively, "Compensation"). The Client agrees it is solely responsible for the accurate calculation of each Compensation payment. During the Term, the Client agrees to reimburse Acosta for (a) pre-approved costs and expenses incurred in connection with Acosta's provision of the Services, and (b) all costs and expenses incurred by Acosta personnel in connection with Client-requested travel, lodging, meals and/or entertainment (e.g. national sales meetings), each in accordance with the Client's travel expense policy attached hereto as Exhibit A. The Client agrees that (a) Acosta is not responsible for any Customer's failure to pay and (b) it will not reduce Acosta's Compensation by any amount (i) if any Customer fails to deliver payment to the Client for the Products for any reason, and/or (ii) assessed before or after the Effective Date by a Customer/retailer/wholesaler and/or third party provider of services, including, without limitation, mandate, reset, retail and/or space technology services. The Client agrees that all hourly rates and rates for full-time equivalents contained herein and in each SOW will increase on each anniversary of the Effective Date by an amount equal to the product of the (a) current hourly rate and (b) cost of living adjustment percentage as determined by the United States Social Security Administration consumer price index for the subject year. The Client agrees that the hourly rates and rates for full-time equivalents contained herein and in each SOW will increase by any legislated amount required by a government agency. The Client agrees that it will be charged separately for all shipping and handling fees related to retail materials, including, point of sale, shelf strips and instantly redeemable coupons.

Section 2.2     Invoicing and Payment. The Client will pay Acosta (a) each Commission on or before the last day of the calendar month for all of the Products shipped to Customers in the immediately preceding calendar month and (b) for each Fee invoice within thirty (30) days of the Client's receipt. In the event the Client fails to pay Acosta in accordance with the provisions of this Agreement, all attorneys' fees, paralegals' fees, costs, expenses and costs charged by a collection agency, and service fees and charges incurred at any stage of a collection proceeding will be borne by the Client.

Section 2.3     Brokerage Statement. The Client will deliver to Acosta along with each Commission payment, a brokerage report in Excel format for Products shipped in the immediately preceding calendar month containing the following information: (a) date of shipment / invoice, (b) invoice number, (c) Customer (ship-to) name and number, (d) Product sales amounts (gross and net, if applicable, as the basis for the commission calculation), (e) itemized deductions authorized by the Net Sales definition, if applicable, (f) the Commission rate, and (g) the Commission amount paid (each, a "Brokerage Statement"). The Client agrees that each Brokerage Statement will substantiate the monthly commission payment delivered to Acosta.

Section 2.4     Product Order Review. The Client agrees to maintain accurate records that arise out of or relate to fulfilling the Product Orders, including shipping receipts and credit memorandums, and readily make such records available to Acosta upon its reasonable request. Each Party must notify the other Party in writing (each, a "Compensation Dispute Notice") of any disputed Compensation within twelve (12) months of (a) Acosta's receipt of each Compensation payment, or (b) each payment of the Compensation by the Client, as applicable. The Parties agree that each Compensation Dispute Notice must contain a detailed description of the Compensation dispute with back up documentation, if available. In the event a Party fails to provide the Compensation Dispute Notice pursuant to the provisions of this Section 2.4, such Party is forever barred from claiming and/or recovering disputed Compensation for the applicable time period. The Parties will negotiate in good faith

EXHIBIT 1
PAGE 12 of 47

to expeditiously resolve any properly noticed Compensation dispute within three (3) months of receipt of the Compensation Dispute Notice.

<u>Section 2.5</u>     <u>Performance Bonus</u>.  During the Term, the Client will pay Acosta the following performance bonus amounts upon achieving or exceeding certain bonus metrics set forth below (each, a "<u>Performance Bonus</u>").  The Client agrees to pay Acosta any Performance Bonus earned within thirty (30) days of the end of each Performance Bonus measurement period.  The Client agrees that (a) each Performance Bonus metric is independently earned and not conditioned upon achieving the remainder of the Performance Bonus metrics, (b) the Performance Bonus metrics are established solely for the purpose of determining Acosta's entitlement to a Performance Bonus, and (c) therefore, it does not constitute a breach of this Agreement if Acosta does not earn a Performance Bonus.  The Parties agree to mutually agree in writing on the Performance Bonus metrics and baselines at least thirty (30) days prior to the next Performance Bonus measurement period.

| Gross product sales generated in connection with this Agreement: | Performance Bonus: |
| --- | --- |
| $60,000,000 | $25,000 |
| $80,000,000 | $50,000 |
| $100,000,000 | $75,000 |

<u>Section 2.6</u>     <u>Change of Control</u>.  During the Term, the Client will provide written notice to Acosta upon completion of a transaction constituting a Change of Control of Client.  The Client agrees to pay to Acosta, in addition to any other payments that are or may become due hereunder, a lump sum payment equal to one percent (1%) of the gross sales price, without deduction or offset (the "<u>Change of Control Payment</u>").  The Client agrees to deliver to Acosta the Change of Control Payment within thirty (30) days of the closing of the Change of Control.  For purposes hereof, "<u>Change of Control</u>" means (a) the sale of all or substantially all of the assets of the Client, or (b) any merger, consolidation or acquisition of the Client with, by or into another corporation, entity or person or (c) any acquisition by one entity or person of 51% or greater of the membership interests or shares, as applicable, of the Client in one or more transactions.

## ARTICLE III:  AGREEMENTS AND COVENANTS

<u>Section 3.1</u>     <u>Product Orders</u>.  Acosta agrees to promptly deliver to the Client all purchase orders for the Products ("<u>Product Orders</u>") for acceptance by the Client.  The Client will use commercially reasonable efforts to accept and fill all Product Orders presented by Acosta.  All Product Orders are subject to acceptance by the Client and may allocate inventory as necessary.  Acosta may not accept any Product Orders on behalf of the Client or bind the Client in any way in connection with any Product sale transaction.  The Client will be responsible for making all final determinations regarding a Customer's credit and the credit terms offered to a Customer.

<u>Section 3.2</u>     <u>Service Policies</u>.  Acosta agrees to market the Products to the Customers in the Territories in accordance with the Client's reasonable policies and procedures (the "<u>Client Policies</u>") delivered to Acosta in writing from time to time during the Term.  All Client Policies are subject to change by the Client upon sixty (60) days' prior written notice to Acosta.

<u>Section 3.3</u>     <u>Client Agreements</u>.  The Client agrees to use commercially reasonable efforts to ship the Products described in each accepted Product Order on the terms contained in each Product Order.  The Client agrees to provide assistance, information and/or materials at its own expense as reasonably requested by Acosta to support its provision of the Services.  During the Term, the Client agrees to (a) maintain insurance coverage in accordance with industry standards, including products liability coverage, (b) name Acosta as an additional insured on at least its products liability policy, and (c) deliver a certificate of insurance to Acosta on the Effective Date that complies with this Section 3.3.

<u>Section 3.4</u>     <u>Confidential Information</u>.  During the Term, the Parties may become privy to non-public confidential or proprietary information of the other Party with respect to such other Party's business, products, research and development, services, pricing, contracts (including with third parties and this Agreement), and its customers, independent contractors, suppliers and other business relations, including information concerning such other Party's intellectual property rights, business and management methods and techniques, market information and analysis, financial reports and statements, instruction manuals, know-how, strategic plans, technology and trade secrets (collectively,

"<u>Confidential Information</u>").  During the Term and for two (2) years thereafter, neither Party shall and, each Party shall cause its Affiliates, agents, employees, subcontractors and representatives not to, disclose, divulge, use or make available any of the Confidential Information of the other Party to any entity or person (a) without the other Party's prior written consent, or (b) in connection with any activity or business other than that of the other Party; provided, however, that this provision shall not apply to information that (i) is part of the public domain; (ii) was demonstrably in the possession of the receiving Party prior to its disclosure; (iii) is hereafter acquired by the receiving Party through a third party under no obligation of confidence, (iv) is independently developed by the receiving Party without the benefit or use of the other Party's information as evidenced by such receiving Party's written records, or (v) which is required to be disclosed by law or court order.  Anything contained in this Agreement to the contrary notwithstanding, the Client authorizes Acosta to disclose to Wal-Mart Stores, Inc. and its affiliates and subcontractors (collectively, "<u>Walmart</u>") all data collected by Acosta during its provision of in-store tasks and activities at Walmart for the Client.

<u>Section 3.5</u>     <u>Non-Solicitation</u>.  During the Term and continuing for six (6) months after the termination of this Agreement, neither Party will actively solicit or hire any employee of the other Party without obtaining the employing Party's prior written consent.  In the event a Party breaches this Section 3.5, the Parties agree that the breaching Party shall pay the non-breaching Party liquidated damages in the amount 125% of the impacted employee(s)' annual base salary for each breach resulting in the loss of an employee from the non-breaching Party.  In the event of such breach, the Parties agree that the monetary loss would not be easily determined, and that the liquidated damages amount is not arbitrary, but fair and reasonable.

## ARTICLE IV:  INDEMNIFICATION; LIABILITY

<u>Section 4.1</u>     <u>Indemnification by Acosta</u>.  Acosta agrees to defend, hold harmless and indemnify (collectively, "<u>Indemnify</u>" or "<u>Indemnification</u>") the Client and its Affiliates, agents, employees, directors, officers and representatives from and against any and all claims, demands, liabilities, losses, damages, injuries (including death), actions, causes of action, suits, proceedings, judgments and expenses, including reasonable attorneys' fees and court costs, including, but not limited to, those costs incurred at the trial and appellate levels and in any bankruptcy, reorganization, insolvency or similar proceeding, and other legal expenses, asserted by a non-Party to this Agreement (collectively, "<u>Claims</u>") arising out of or related to Acosta's negligence during the Term.

<u>Section 4.2</u>     <u>Indemnification by Client</u>.  The Client agrees to Indemnify Acosta and its Affiliates, agents, employees, directors, officers and representatives from and against any and all Claims arising out of or related to (a) the Client's negligence, and/or (b) the delivery, discontinuance, distribution, manufacture, sale, use of, labeling or any casualty to the Products, including product liability claims.

<u>Section 4.3</u>     <u>Indemnification Procedures</u>.  Within thirty (30) business days after receipt of any Claim notice, the indemnifying Party shall undertake the Indemnification of each such Claim.  If the indemnifying Party fails to undertake and sustain the Indemnification of any Claim in the manner required by this Agreement, the indemnified Party may engage separate counsel to Indemnify such Claim; provided, however, the indemnified Party cannot admit liability for the indemnifying Party and/or obligate it to pay a monetary obligation without obtaining the prior written consent of the indemnifying Party.  If the indemnifying Party undertakes the Indemnification of a Claim in the manner required by this Section 4.3, the indemnified Party may, at its own expense, engage separate counsel and participate in the Indemnification of any Claim brought against it.  The indemnified Party agrees to cooperate with the indemnifying Party in the investigation and Indemnification of the Claim.  Following the settlement or adjudication of any Claim within the scope of Section 4.1 or Section 4.2(a), the indemnifying Party shall be entitled to contribution for the Indemnification costs from the indemnified Party to the extent of the indemnified Party's (or its related indemnitees') actual fault or negligence.  In the absence of an adjudicated allocation of fault, the Parties shall make good faith efforts to allocate fault between them before pursuing any related legal action against each other.

<u>Section 4.4</u>     <u>Limitation of Liability</u>. EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS UNDER SECTION 4.1 AND SECTION 4.2, NEITHER PARTY WILL, IN ANY EVENT, BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL DAMAGES, OR LOST PROFITS, EVEN IF SUCH OTHER PARTY HAS BEEN ADVISED OF THE LIKELIHOOD OR POSSIBILITY OF SUCH DAMAGES REGARDLESS OF WHETHER THE CLAIM IS MADE IN CONTRACT, TORT, OR PURSUANT TO STATUTE.  ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, ACOSTA'S LIABILITY FOR

EXHIBIT 1
PAGE 13 of 47

ANYTHING ARISING OUT OF THIS AGREEMENT, OR THE RELATIONSHIPS CREATED BY THE AGREEMENT, REGARDLESS OF WHETHER THE CLAIM IS MADE IN CONTRACT, TORT, OR PURSUANT TO STATUTE, WILL BE LIMITED TO THE LESSER OF THE DAMAGES INCURRED BY THE CLIENT OR THE TOTAL FEES PAID TO ACOSTA DURING THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE DATE ON WHICH THE FACTS OR CIRCUMSTANCES THAT GAVE RISE TO THE CAUSE OF ACTION FIRST OCCURRED.

Section 4.5    Disclaimer. ACOSTA DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE SERVICES; SPECIFICALLY, ACOSTA DISCLAIMS ANY WARRANTY (A) REGARDING THE AMOUNT OF PRODUCT SALES THAT MAY BE GENERATED FROM THE SERVICES DURING THE TERM OR (B) REGARDING ANY ECONOMIC OR OTHER BENEFIT THAT CLIENT MAY OBTAIN BY ENGAGING ACOSTA TO PROVIDE THE SERVICES.

## ARTICLE V:  REPRESENTATIONS AND WARRANTIES

Section 5.1    Representations and Warranties. Each Party represents and warrants to the other Party that (a) it has the full power and authority to enter into this Agreement, (b) the execution, delivery and performance of this Agreement has been duly authorized and constitutes a valid and binding agreement of such Party, (c) the execution, delivery and performance of this Agreement shall not result in the breach of, or constitute a default under, or violate any provision of, any agreement or other instrument to which such Party is a party, and (d) it will perform its obligations described herein in accordance with all applicable laws, rules and regulations. The Client represents and warrants that its Products will be manufactured in compliance with all applicable ethical standards, laws, orders and permits, and the Client Policies in effect from time to time during the Term.

## ARTICLE VI:  MISCELLANEOUS

Section 6.1    Affiliate. "Affiliate" means any entity or individual that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the specified entity or individual. As used in this definition of Affiliate, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity or individual, whether through ownership of voting securities, by contract or otherwise.

Section 6.2    Notices. All demands, documents, notices, payments, reports, requests, returns or other communications ("Notices") delivered pursuant to the provisions contained in this Agreement, any SOW and other applicable law will be in writing and will be deemed to be sufficient if (a) delivered personally, (b) mailed by registered or certified mail, return receipt requested, postage prepaid, or (c) sent by a nationally-recognized, overnight courier, to the Parties at their respective addresses contained in this Agreement. All such Notices will be deemed to have been delivered and received (a) in the case of personal delivery, on the date of such delivery, (b) in the case of delivery by certified or registered mail, on the third (3rd) business day following such mailing, and (c) in the case of delivery by a nationally-recognized, overnight courier guaranteeing next business day delivery, on the business day following dispatch.

Section 6.3    Independent Contractor. Acosta's engagement and provision of the Services shall be as an independent contractor to the Client, and neither Acosta nor any of its Affiliates, agents, employees, directors, subcontractors or representatives shall be an employee, joint venturer or partner of the Client for any reason. As an independent contractor to the Client, Acosta shall be solely responsible for all federal, local, provincial and state employment (including self-employment), income, social security and other similar levies and taxes payable by Acosta on or with respect to its receipt of the Compensation.

Section 6.4    Assignment; Further Assurances; No Presumption Against Drafter. This Agreement and each SOW may not be assigned by either Party without the prior written consent of the other Party. Each of the Parties shall execute any other documents and take any other actions as may be reasonably necessary to carry out the intent and purpose of this Agreement and each SOW. The Parties agree that, despite any legal presumption or common law doctrine to the contrary, this Agreement shall not be construed against the drafter as both Parties have had the opportunity to review and accept the provisions contained in this Agreement and each SOW.

Section 6.5    Force Majeure. No Party will be held in breach of any provision of this Agreement if such breach arises out of or results from causes beyond the reasonable control of the Party required to take such action, including actions of or interference by governmental or other regulatory authorities, acts of God (including

flood, fire or acts of nature), acts of terrorism, epidemics or pandemics (including viruses), labor disturbance, wars, riots or other civil disturbances.

Section 6.6    Waivers; Severability. No failure or delay by any Party in exercising any right, power or privilege under this Agreement or any SOW shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. In the event that any part of this Agreement or any SOW shall be declared unenforceable or invalid, the remaining parts shall continue to be valid and enforceable.

Section 6.7    Governing Law and Venue; Waiver of Jury Trial. The execution, validity, interpretation and performance of this Agreement and each SOW shall be governed by Florida law. Each of the Parties irrevocably and unconditionally submits, for itself and its assets, to the exclusive jurisdiction and venue of any Florida state court or United States federal court sitting in or having jurisdiction over Jacksonville, Florida and any appellate court from any such Florida state court or federal court, in any proceeding arising out of or related to this Agreement and each SOW. Each Party agrees to bring a claim arising out of or related to this Agreement  or any SOW within two (2) years of discovery of the claim or its right to bring and recover from such claim is forever barred. THE PARTIES HEREBY INTENTIONALLY, KNOWINGLY AND VOLUNTARILY WAIVE ALL OF THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY PROVISION CONTAINED IN THIS AGREEMENT AND EACH SOW.

Section 6.8    Counterparts; Entire Agreement. This Agreement and each SOW may be executed by facsimile, e-signature, or pdf/email and/or in counterparts and any such execution shall be a valid and binding execution hereof. This Agreement (including all SOWs) embodies the entire agreement and understanding of the Parties hereto, and supersedes all prior or contemporaneous written or oral communications, representations and agreements between Acosta and Client, regarding the subject matter hereof. This Agreement and each SOW may only be amended by written agreement between Acosta and Client.

IN WITNESS WHEREOF, the Parties executed this Agreement as of April 1, 2023.

ACOSTA: Acosta Inc.

Signature:

Name: Karey Murphy

Title:  SVP Operational Finance

CLIENT: VNGR Beverage  LLC dba Poppi

Signature:

Name: Jeff Rubenstein

Title:  Chief Sales Officer

EXHIBIT 1
PAGE 14 of 47

# EXHIBIT B

**EXHIBIT 1**
**PAGE 15 of 47**

Who We Are          Our Impact          Our Brands          Our Stories          Investors          Resources

Contact          US

March 17, 2025    |    **PressRelease**

|    Performance

# PepsiCo to Acquire poppi

   

- *Company continues to evolve its portfolio through innovation and strategic acquisitions*
- *Company expands better-for-you offerings to meet consumer*

*preferences and continue to serve*
*new generations of consumers*

PURCHASE, N.Y. and AUSTIN, Texas, March 17, 2025 /PRNewswire/ -- PepsiCo, Inc. (NASDAQ: PEP) ("PepsiCo") today announced that it has entered into a definitive agreement to acquire poppi, a fast-growing prebiotic soda brand, for $1.95 billion, including $300 million of anticipated cash tax benefits for a net purchase price of $1.65 billion. The transaction also includes an additional potential earnout consideration subject to the achievement of certain performance milestones within a specified period after closing of the transaction.



EXHIBIT 1
PAGE 17 of 47

"We've been evolving our food and beverage portfolio over many years, including by innovating with our brands in new spaces and through disciplined, strategic acquisitions that enable us to offer more positive choices to our consumers," said Ramon Laguarta, Chairman and CEO, PepsiCo. "More than ever, consumers are looking for convenient and great-tasting options that fit their lifestyles and respond to their growing interest in health and wellness. poppi is a great complement to our portfolio transformation efforts to meet these needs."

poppi is a fast-growing functional soda brand that combines prebiotics, fruit juice, and apple cider vinegar to create a deliciously refreshing low calorie soda with no more than five grams of sugar per serving. poppi's consumer-first approach, cultural cache, and nutritional profile have nurtured a loyal fan base and driven rapid growth. poppi was created by Allison and Stephen Ellsworth, discovered on Shark Tank by Rohan Oza and funded by CAVU Consumer Partners from their initial seed round to today.

**EXHIBIT 1**
**PAGE 18 of 47**

"As we look to reorient our portfolio offerings to address white space consumer needs, the poppi brand's unique intersection with wellness and culture is a perfect addition to our portfolio," said Ram Krishnan, CEO, PepsiCo Beverages U.S. "Allison and the poppi team have built a magnetic brand that's ahead of the trends, with a loyal consumer base and a demonstrated capacity for growth. We are big fans of the poppi brand movement and believe this incredible brand paired with our commercial capabilities will drive continued growth and innovation for years to come."

"When I created poppi in our kitchen, it was fueled by a desire to create a better-for-you soda," said Allison Ellsworth, Co-Founder of poppi. "We never imagined how many people we could reach through hard work, determination and a clear mission to create a functional soda that stands the test of time. We believe poppi is the soda that will be embraced for generations to come, and we're beyond grateful to the amazing poppi team, our partners who believed in us from the

very beginning and most importantly
our incredible community. We can't wait
to begin this next chapter with PepsiCo
to bring our soda to more people – and I
know they will honor what makes poppi
so special while supporting our next
phase of growth and innovation. I hope
our story inspires others to explore their
passions, take the risk, and believe that
anything is possible."

"poppi is a true testament to the
American Dream! From the kitchen to
Shark Tank to becoming an iconic
brand, this couldn't have been done
without the amazing founders Allison
and Stephen Ellsworth, the incredible
team in place led by CEO Chris Hall, the
unmatched support of CAVU's
Uncommon team led by Stevie
Clements, and the extraordinary poppi
community," said Rohan Oza, Guest
Shark on ABC's Shark Tank and Co-
Founder at CAVU Consumer Partners.
"We're beyond thrilled to be partnering
with PepsiCo so that even more
consumers across America, and the
world, can enjoy poppi – a truly modern
soda for the next generation."

EXHIBIT 1
PAGE 20 of 47

The transaction is subject to customary closing conditions, including regulatory approval. Additional terms of the acquisition were not disclosed.

Centerview Partners LLC is acting as lead financial advisor to PepsiCo, and J.P. Morgan Securities LLC is also acting as a financial advisor to PepsiCo. Cravath, Swaine & Moore LLP is acting as legal advisor to PepsiCo, and Davis Polk & Wardwell LLP is acting as tax counsel to PepsiCo. Goldman Sachs & Co. LLC is acting as financial advisor to poppi, and Cooley LLP is acting as legal advisor to poppi.

**About PepsiCo:**

PepsiCo products are enjoyed by consumers more than one billion times a day in more than 200 countries and territories around the world. PepsiCo generated nearly $92 billion in net revenue in 2024, driven by a complementary beverage and convenient foods portfolio that includes Lay's, Doritos, Cheetos, Gatorade, Pepsi-Cola, Mountain Dew, Quaker, and SodaStream. PepsiCo's product portfolio includes a wide range of enjoyable

**EXHIBIT 1**
**PAGE 21 of 47**

foods and beverages, including many iconic brands that generate more than $1 billion each in estimated annual retail sales.

Guiding PepsiCo is our vision to Be the Global Leader in Beverages and Convenient Foods by Winning with pep+ (PepsiCo Positive). pep+ is our strategic end-to-end transformation that puts sustainability and human capital at the center of how we will create value and growth by operating within planetary boundaries and inspiring positive change for planet and people. For more information, visit www.PepsiCo.com.

**About poppi:**

poppi is a prebiotic soda brand modernizing soda for the next generation. Founded by husband-and-wife duo Stephen & Allison Ellsworth, Austin, TX-based poppi combines prebiotics and fruit juice to create a deliciously refreshing, mouthwatering low calorie soda with no more than 5 grams of sugar per serving. What originally started as a home-brewed concoction quickly became a farmers' market favorite turned Shark Tank

investment and is now available at major retailers nationwide. poppi's brand-first approach, cultural cache, and rapid growth have nurtured an incredibly loyal community, including celebrity fans. poppi is available in 14 delicious flavors – Strawberry Lemon, Raspberry Rose, Orange, Ginger Lime, Watermelon, Cherry Limeade, Grape, Wild Berry, Classic Cola, Root Beer, Doc Pop, Lemon Lime, Orange Cream and Cherry Cola. For more information, visit drinkpoppi.com, or follow @drinkpoppi on Instagram and TikTok.

## PepsiCo Cautionary Statement

Statements in this communication that are "forward-looking statements" are based on currently available information, operating plans and projections about future events and trends. Terminology such as "believe," "expect," "future," "intend," "may," "plan," "position," "potential," "should," "will" or similar statements or variations of such words and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such terms. Forward-looking

**EXHIBIT 1**
**PAGE 23 of 47**

statements inherently involve risks and
uncertainties that could cause actual
results to differ materially from those
predicted in such forward-looking
statements. Such risks and uncertainties
include, but are not limited to:  future
demand for PepsiCo's products; damage
to PepsiCo's reputation or brand image;
product recalls or other issues or
concerns with respect to product
quality and safety; PepsiCo's ability to
compete effectively; PepsiCo's ability to
attract, develop and maintain a highly
skilled workforce or effectively manage
changes in our workforce; water
scarcity; changes in the retail landscape
or in sales to any key customer;
disruption of PepsiCo's manufacturing
operations or supply chain, including
increased commodity, packaging,
transportation, labor and other input
costs; political, social or geopolitical
conditions in the markets where
PepsiCo's products are made,
manufactured, distributed or sold;
PepsiCo's ability to grow its business in
developing and emerging markets;
changes in economic conditions in the
countries in which PepsiCo operates;
future cyber incidents and other

EXHIBIT 1
PAGE 24 of 47     9/13

disruptions to our information systems;
failure to successfully complete or
manage strategic transactions;
PepsiCo's reliance on third-party service
providers and enterprise-wide systems;
climate change or measures to address
climate change and other sustainability
matters; strikes or work stoppages;
failure to realize benefits from PepsiCo's
productivity initiatives or organizational
restructurings; deterioration in
estimates and underlying assumptions
regarding future performance of our
business or investments that can result
in impairment charges; fluctuations or
other changes in exchange rates; any
downgrade or potential downgrade of
PepsiCo's credit ratings; imposition or
proposed imposition of new or
increased taxes aimed at PepsiCo's
products; imposition of limitations on
the marketing or sale of PepsiCo's
products; changes in laws and
regulations related to the use or
disposal of plastics or other packaging
materials; failure to comply with
personal data protection and privacy
laws; increase in income tax rates,
changes in income tax laws or
disagreements with tax authorities;

failure to adequately protect PepsiCo's intellectual property rights or infringement on intellectual property rights of others; failure to comply with applicable laws and regulations; and potential liabilities and costs from litigation, claims, legal or regulatory proceedings, inquiries or investigations.

For additional information on these and other factors that could cause PepsiCo's actual results to materially differ from those set forth herein, please see PepsiCo's filings with the SEC, including its most recent annual report on Form 10-K and subsequent reports on Forms 10-Q and 8-K. Investors are cautioned not to place undue reliance on any such forward-looking statements, which speak only as of the date they are made. We undertake no obligation to update any forward-looking statement, whether as a result of new information, future events or otherwise.

## Media Contacts:

pepsicomediarelations@pepsico.com

press@drinkpoppi.com

**EXHIBIT 1**
**PAGE 26 of 47**



SOURCE PepsiCo, Inc.

**Topics:**  Performance

**Media Resources:**

Media Gallery  Media Contacts

# Catch up on more PepsiCo news

**Performance**

**PepsiCo Announces Webcast of Annual Shareholders' Meeting**

**Performance**

**PepsiCo Announces Timing and Availability of First-Quarter 2025 Financial Results**

**Performance**

**PepsiCo to Present at the Consumer Analyst Group of New York Conference**

**EXHIBIT 1**
**PAGE 27 of 47**

**Performance**

**PepsiCo Declares Quarterly Dividend**

# Press Releases

Back to top

Careers

Global Sites

Media Gallery

Site Map

© PepsiCo 2025        Terms of Use        Privacy Policy        Accessibility Statement        About

Our Ads        Modern Slavery Statement

Frito Lay        PepsiCo Product Facts        PepsiCo Partners        PepsiCo Labs

PepsiCo Design

Cookie Preferences

**EXHIBIT 1**
**PAGE 28 of 47**

# EXHIBIT C

EXHIBIT 1
PAGE 29 of 47



Via FedEx
*Advance Copy Via Email – Bridget.Lasda@drinkpoppi.com*

April 15, 2025

Bridget Lasda
Chief Sales Officer
VNGR Beverage, LLC d/b/a Poppi
31 Navasota Street, Suite 270
Austin, TX 78702

      **Re:    Acosta Inc. – Master Services Agreement**

Dear Bridget:

      I am writing in response to your February 20, 2025, letter that purports to terminate the Master Services Agreement, dated April 1, 2023, between Acosta Inc. ("Acosta") and VNGR Beverage, LLC d/b/a Poppi ("Poppi") (the "MSA"), effective as of March 23, 2025. The MSA only allows termination without cause upon thirty days' written notice if Acosta is no longer performing any services under it. Poppi's purported March 23, 2025, termination is ineffective because Acosta continues to perform services under the MSA at Poppi's request. For example, Acosta is continuing to provide services in connection with both the military channel, to include selling Poppi products to military ships, as well as at Costco.  Until all of that work is complete, and Acosta has fully ceased providing services on Poppi's behalf, Poppi cannot provide notice of its intent to terminate the MSA.

      Moreover, termination of the MSA also requires Poppi to immediately bring itself current on all financial obligations to Acosta. Despite the purported termination of the MSA Poppi continues to owe Acosta $2,621 for services in the military channel, which sums are past due, and $347,651.65 for services at Costco, which sums are past due. Further, Poppi has not provided Acosta with the order data from the represented retailer databases for any of the broker statements to enable Acosta to verify the amounts paid. As such, in addition to paying the past due amounts, Poppi must immediately send Acosta all order data pursuant to Section 2.3 of the MSA.  Acosta reserves the right to update the amounts due from Poppi upon completion of the audit once the order data is received.

      Poppi's purported termination while simultaneously accepting the benefits of Acosta's continued performance is causing Acosta concern as it appears Poppi is attempting to fabricate a reason not to pay Acosta the Change of Control Payment to which Acosta is already entitled under

**EXHIBIT 1
PAGE 30 of 47**

Section 2.6 of the MSA. Based on PepsiCo's March 17, 2025, public announcement, PepsiCo and Poppi entered into a definitive agreement on or before March 17, 2025, for PepsiCo to acquire Poppi. Upon the entry of such definitive agreement, Acosta earned that bonus and is expecting to be paid the approximately $19.5 million Change of Control Payment within the time provided in the MSA. We ask that Poppi promptly confirm that it will timely pay the Change of Control Payment to Acosta in accord with Section 2.6 of the MSA.

Sincerely,

*John Caruso*

John Caruso, Corporate National SVP, Business Development

**EXHIBIT 1**
**PAGE 31 of 47**

# EXHIBIT D

EXHIBIT 1
PAGE 32 of 47



Megan L. Donohue
T: +1 858 550 6085
mdonohue@cooley.com

**Confidential**
Via E-Mail to: awachs@sgrlaw.com

April 25, 2025

Alan S. Wachs
Counsel for Acosta Inc.
Smith, Gambrell Russell
50 N. Laura Street, Ste 2600
Jacksonville, FL 32202

**Re:      Acosta Inc. – Master Services Agreement**

Dear Mr. Wachs:

We write on behalf of our client, VNGR Beverage, LLC d/b/a Poppi ("Poppi"), in response to Mr. Caruso's April 15, 2025 letter ("Letter") on behalf of Acosta Inc. ("Acosta") regarding Poppi's February 20, 2025 termination of the Master Services Agreement ("MSA") with Acosta.[1]

The underlying facts are not in dispute.  Section 1.2 of the MSA allows either party to terminate the MSA upon 30 days' written notice if there is no outstanding Statement of Work ("SOW").  In compliance with this clause and the termination provisions of the outstanding SOWs, Poppi terminated the outstanding SOWs. First, Poppi provided notice of termination of the Statement of Work dated April 1, 2023 between Acosta and Poppi regarding the Natural and Grocery channels ("Natural and Grocery Channels SOW") on October 29, 2024, and Acosta confirmed the termination in writing on October 31, 2024.  As a result, on November 20, 2024 Poppi confirmed in writing that the Natural and Grocery Channels SOW would terminate on January 27, 2025.  On January 30, 2025, Acosta confirmed the termination of the Natural and Grocery Channels SOW.  Similarly, on November 4, 2024, Poppi terminated the OeP | Acosta Walmart 1P/3P Services dated August 15, 2024 between OeP, LLC and Poppi related to Walmart Online support ("Walmart SOW"), and on November 12, 2024 Acosta confirmed that the Walmart SOW would terminate as of November 30, 2024.  Subsequently, on February 7, 2025, Poppi gave Acosta 90 days written notice that the final outstanding SOW, the Statement of Work – Foodservice dated August 1, 2024 between Core Group, Inc., an affiliate of Acosta, and Poppi ("Foodservice SOW") would terminate on May 8, 2025, that Poppi was not aware of any other SOWs under the MSA and that to the extent any existed, they too would terminate on May 8, 2025.  Shortly thereafter, Poppi and Acosta mutually agreed to terminate the Foodservice SOW early, effective immediately as of February 19, 2025.  Given that all outstanding SOWs were properly terminated, Poppi provided 30 days' written notice to Acosta on February 20, 2025, that the MSA would terminate on March 23, 2025.

Acosta confirmed each of the above terminations of the SOWs and never objected to the March 23, 2025 termination of the MSA until April 15, 2025, at which point Acosta incorrectly asserted that "Acosta continues to perform services under the MSA at Poppi's request."  (Letter at 1.)   Notably, this assertion comes only weeks after PepsiCo's March 17, 2025 announcement that it intended to acquire Poppi.  Now, Acosta is wrongfully claiming that Poppi owes Acosta a Change of Control Payment.  (Letter at 2–3.)

---

[1] Poppi's response to the Letter is confidential and provided pursuant to the protections under California and federal law regarding settlement communications.  Nothing in this response constitutes an admission or waiver of Poppi's defenses, rights, or remedies.

Cooley LLP   10265 Science Center Drive   San Diego, CA   92121-1117
t: +1 858 550 6000  f: +1 858 550-6420  cooley.com

**EXHIBIT 1**
**PAGE 33 of 47**



Acosta's objection to Poppi's valid termination of the MSA and insistence that Poppi owes Acosta a Change of Control Payment is unfounded.

1. The MSA was properly terminated effective March 23, 2025. Termination of the MSA under Section 1.2 simply requires (1) 30 days' written notice and (2) that there be no outstanding SOWs. On February 20, 2025, after Poppi and Acosta **_mutually agreed_** to immediately terminate the remaining Foodservice SOW (i.e., the only remaining SOW under the MSA) early on February 19, 2025, Poppi provided proper notice of termination to Acosta. Given the 30-day notice period, this meant the MSA terminated on March 23, 2025. The terms of Section 1.2 do not provide an exception for a situation where Acosta vaguely claims that it is continuing to provide services outside of outstanding SOWs. To the contrary, Section 1.3 requires Acosta to "immediately discontinue providing the Services" under the MSA in the event of an early termination, meaning Acosta cannot now claim that the MSA was not validly terminated, even if Acosta continued to perform services in contravention of Section 1.3.

2. Regardless, Acosta's claim that it continues to provide services for the military and Costco channels is simply incorrect and irrelevant. Any work for military channels terminated as of December 15, 2024, as noted in Poppi's letter of November 20, 2024. Similarly, the separate Representation Agreement regarding Costco services was terminated as of January 27, 2025, again as noted in Poppi's letter of November 20, 2024. And Poppi has not received any outstanding invoices from Acosta for services rendered after these termination dates. In any event, neither of those channels are governed by an operative SOW under Section 1.1 of the MSA; rather, there is no written agreement with Acosta regarding the military channel and the Costco channel is governed by a separate (and now terminated) representation agreement.

3. Acosta's reading of Section 2.6's Change of Control clause is incorrect. Section 2.6 states that, "[d]uring the Term" of the MSA and "**_upon the completion of a transaction_** constituting a Change of Control," Poppi must pay Acosta a Change of Control Payment "within thirty (30) days of the **_closing of the Change of Control_**." Thus, a Change of Control Payment is only payable if a change of control is completed and closed during the term of the MSA. Because PepsiCo's acquisition of Poppi has yet to close (and may not close for several more months), no Change of Control Payment is owed to Acosta.

Given that the express terms of the MSA both (1) confirm the validity of Poppi's termination of the MSA and (2) bar Acosta's improper attempt to force Poppi to pay Acosta a "bonus" for an acquisition that has not even closed, no Change of Control Payment is due to Acosta. Should you have any questions regarding the above, I am happy to discuss.

Sincerely,

Megan L. Donohue

# EXHIBIT E

**EXHIBIT 1**
**PAGE 35 of 47**

Who We Are        Our Impact        Our Brands        Our Stories        Investors        Resources

Contact        US

May 19, 2025        |        **PressRelease**

|        Performance

# PepsiCo Completes Acquisition of poppi, Accelerating Strategic Portfolio Transformation

  

**EXHIBIT 1**
**PAGE 36 of 47**

- *Acquisition Advances Positive Choices Growth Strategy and Enhances PepsiCo Functional Food and Beverage Offerings*

PURCHASE, N.Y. and AUSTIN, Texas, May 19, 2025 /PRNewswire/ -- PepsiCo, Inc. (NASDAQ: PEP) ("PepsiCo") today announced that it has closed the acquisition of poppi for $1.95 billion, including $300 million of anticipated cash tax benefits for a net purchase price of $1.65 billion. The transaction also includes a performance-based earnout contingent on achieving certain performance metrics.



This acquisition marks a significant step in PepsiCo's ongoing transformation of its portfolio, reinforcing its commitment to meeting evolving consumer preferences for great-tasting, functional

products. poppi, a fast-growing
prebiotic soda brand, is among
PepsiCo's recent acquisitions, including
Siete and Sabra, aimed at aligning with
consumers' modern wellness priorities.

"poppi represents a compelling
strategic fit within our short- and long-
term vision for the future of
beverages," said Ram Krishnan, CEO of
PepsiCo Beverages U.S. "Its rapid
growth, strong consumer engagement,
and differentiated functional positioning
make it a dynamic addition to our
portfolio. We are excited to scale
poppi's momentum and unlock new
growth through our capabilities – we're
just getting started."

On a mission to modernize soda for the
next generation, poppi is a fast-growing
functional soda brand made with
prebiotics, fruit juice, and apple cider
vinegar – offering a refreshing, low-
calorie drink with no more than five
grams of sugar per serving. poppi has
taken a community- and culture-first
approach – from vibrant packaging to a
strong social media presence, viral
TikTok campaigns, and influencer

EXHIBIT 1
PAGE 38 of 47

partnerships – all of which have cultivated a loyal community and effectively engaged Gen Z and millennial audiences.

"PepsiCo's belief in the poppi brand is a tremendous validation of the work we've done to advance our mission," said Chris Hall, CEO of poppi. "Their partnership and resources will be instrumental as we scale to our next phase of growth. We're incredibly grateful to our passionate community and look forward to welcoming even more consumers into the poppi portfolio."

Centerview Partners LLC acted as lead financial advisor to PepsiCo, and J.P. Morgan Securities LLC also served as a financial advisor to PepsiCo. Cravath, Swaine & Moore LLP acted as legal advisor to PepsiCo, and Davis Polk & Wardwell LLP acted as tax counsel to PepsiCo. Goldman Sachs & Co. LLC acted as financial advisor to poppi, and Cooley LLP acted as legal advisor to poppi.

EXHIBIT 1
PAGE 39 of 47

## About PepsiCo

PepsiCo products are enjoyed by consumers more than one billion times a day in more than 200 countries and territories around the world. PepsiCo generated nearly $92 billion in net revenue in 2024, driven by a complementary beverage and convenient foods portfolio that includes Lay's, Doritos, Cheetos, Gatorade, Pepsi-Cola, Mountain Dew, Quaker, and SodaStream. PepsiCo's product portfolio includes a wide range of enjoyable foods and beverages, including many iconic brands that generate more than $1 billion each in estimated annual retail sales.

Guiding PepsiCo is our vision to Be the Global Leader in Beverages and Convenient Foods by Winning with pep+ (PepsiCo Positive). pep+ is our strategic end-to-end transformation that puts sustainability and human capital at the center of how we will create value and growth by operating within planetary boundaries and inspiring positive change for planet and people. For more information, visit www.PepsiCo.com.

**About poppi:**

poppi is a prebiotic soda brand modernizing soda for the next generation. Founded by husband-and-wife duo Stephen & Allison Ellsworth, Austin, TX-based poppi combines prebiotics and fruit juice to create a deliciously refreshing, mouthwatering low calorie soda with no more than 5 grams of sugar per serving. What originally started as a home-brewed concoction quickly became a farmers' market favorite turned Shark Tank investment and is now available at major retailers nationwide. poppi's brand-first approach, cultural cache, and rapid growth have nurtured an incredibly loyal community, including celebrity fans. poppi is available in 15 delicious flavors – Strawberry Lemon, Raspberry Rose, Orange, Ginger Lime, Watermelon, Cherry Limeade, Grape, Wild Berry, Classic Cola, Root Beer, Doc Pop, Lemon Lime, Orange Cream, Cherry Cola and Alpine Blast. For more information, visit drinkpoppi.com, or follow @drinkpoppi on Instagram and TikTok.

**PepsiCo Cautionary Statement**

Statements in this communication that

EXHIBIT 1
PAGE 41 of 47

are "forward-looking statements" are based on currently available information, operating plans and projections about future events and trends. Terminology such as "believe," "expect," "future," "intend," "may," "plan," "position," "potential," "should," "will" or similar statements or variations of such words and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such terms. Forward-looking statements inherently involve risks and uncertainties that could cause actual results to differ materially from those predicted in such forward-looking statements. Such risks and uncertainties include, but are not limited to:  future demand for PepsiCo's products; damage to PepsiCo's reputation or brand image; product recalls or other issues or concerns with respect to product quality and safety; PepsiCo's ability to compete effectively; PepsiCo's ability to attract, develop and maintain a highly skilled workforce or effectively manage changes in our workforce; water scarcity; changes in the retail landscape or in sales to any key customer;

disruption of PepsiCo's manufacturing operations or supply chain, including increased commodity, packaging, transportation, labor and other input costs; political, social or geopolitical conditions in the markets where PepsiCo's products are made, manufactured, distributed or sold; PepsiCo's ability to grow its business in developing and emerging markets; changes in economic conditions in the countries in which PepsiCo operates; future cyber incidents and other disruptions to our information systems; failure to successfully complete or manage strategic transactions; PepsiCo's reliance on third-party service providers and enterprise-wide systems; climate change or measures to address climate change and other sustainability matters; strikes or work stoppages; failure to realize benefits from PepsiCo's productivity initiatives or organizational restructurings; deterioration in estimates and underlying assumptions regarding future performance of our business or investments that can result in impairment charges; fluctuations or other changes in exchange rates; any downgrade or potential downgrade of

EXHIBIT 1
PAGE 43 of 47

PepsiCo's credit ratings; imposition or
proposed imposition of new or
increased taxes aimed at PepsiCo's
products; imposition of limitations on
the marketing or sale of PepsiCo's
products; changes in laws and
regulations related to the use or
disposal of plastics or other packaging
materials; failure to comply with
personal data protection and privacy
laws; increase in income tax rates,
changes in income tax laws or
disagreements with tax authorities;
failure to adequately protect PepsiCo's
intellectual property rights or
infringement on intellectual property
rights of others; failure to comply with
applicable laws and regulations; and
potential liabilities and costs from
litigation, claims, legal or regulatory
proceedings, inquiries or investigations.

For additional information on these and
other factors that could cause PepsiCo's
actual results to materially differ from
those set forth herein, please see
PepsiCo's filings with the SEC, including
its most recent annual report on Form
10-K and subsequent reports on Forms
10-Q and 8-K. Investors are cautioned

EXHIBIT 1
PAGE 44 of 47

not to place undue reliance on any such
forward-looking statements, which
speak only as of the date they are made.
We undertake no obligation to update
any forward-looking statement, whether
as a result of new information, future
events or otherwise.

**Media Contacts:**

pepsicomediarelations@pepsico.com

press@drinkpoppi.com



SOURCE PepsiCo, Inc.

**Topics:**  Performance

**Media Resources:**
Media Gallery   Media Contacts

# Catch up on more PepsiCo news

EXHIBIT 1
PAGE 45 of 47

Performance

## PepsiCo Declares Quarterly Dividend

Performance

## PepsiCo Announces Webcast of Annual Shareholders' Meeting

Performance

## PepsiCo to Acquire poppi

Performance

## PepsiCo Announces Timing and Availability of First-Quarter 2025 Financial Results

## Press Releases

Back to top

Careers

Global Sites

Media Gallery

Site Map

**EXHIBIT 1**
**PAGE 46 of 47**

© PepsiCo 2025        Terms of Use      Privacy Policy      Accessibility Statement      About

Our Ads      Modern Slavery Statement


Frito Lay      PepsiCo Product Facts      PepsiCo Partners      PepsiCo Labs

PepsiCo Design

        Cookie Preferences

**EXHIBIT 1**
**PAGE 47 of 47**